Frank & Dugan *v.* Herold.

FRANK & DUGAN

*v.*

CLEMENS HEROLD et al.

[Filed October 11th, 1902.]

1. The act of February 14th, 1883 (*P. L. of 1883 p. 36*), providing "that it shall not be unlawful for any two or more persons to unite, combine or bind themselves by oath, covenant, agreement, alliance or otherwise to persuade, advise or encourage, by peaceable means, any person or persons to enter into any combination for or against leaving or entering into the employment of any person, persons or corporation," merely renders innocent as against the public an act which, previous to its passage, was a misdemeanor punishable by indictment, and does not take away or in anywise affect any private rights which may arise out of the acts which are legalized thereby.

2. Every free person not subject to criminal restraint has a right to work where he sees fit, and no other person has a right to prevent his doing so, or, without his consent, even to endeavor to persuade him to quit.

3. To make out the relation of master and servant, it is not necessary that there be any written, or even verbal, contract between the parties to

work for any particular length of time, but the relation exists where ·one person is willing to work for another from day to day, and that other desires the labor and makes his business arrangements accordingly.

4. Employers, where third parties interfere with their employes against the latter's consent, and endeavor by unlawful means to induce them to ·quit work, have a right to sue for relief.

5. Injunction is the proper remedy for an employer where numerous third parties interfere with his employes against the latter's consent, and ·endeavor by unlawful means to induce them to quit work.

The bill in this cause was filed on the 18th of April, 1901, by the complainants, Frank & Dugan, against upwards of eighty ·defendants, and to it was annexed numerous affidavits charging that the defendants were conspiring and acting together and .separately to prevent certain operatives of the complainants from ·continuing to work for them.

On presentation of the bill and affidavits to a vice-chancellor .an order was made, returnable on May 20th, commanding the ·defendants named to show cause why an injunction should not .issue in accordance with the prayer of the bill, and in the mean-·time restraining them from doing a variety of things specified, ·which tended, as was alleged, to prevent the operatives of the ·complainants from continuing in their employ.

On the 1st of May, and before the return of the previous order, ·numerous affidavits were presented to the vice-chancellor tend-ing to show that certain of the defendants named in the bill had ·disobeyed the order of the 18th of April; and on that day— May 1st—an order was made calling on twenty-three of the ·defendants to show cause, on the 20th of May, which was the return day of the original order, why they should not be ad-.judged guilty of contempt of the court and punished therefor.

On or before May 20th the hearing on both these orders was :adjourned, by written consent, until the 3d of June.

On June 3d the complainants, by their counsel, and the· de-fendants, by their counsel, appeared before the court, at the ·chancery chambers in Jersey City, and a motion was made by ·the counsel of complainants for the issuing of an injunction in accordance with the prayer of the bill, and for an adjudication ·of contempt against the defendants who wére charged in the

Frank & Dugan v. Herold.

affidavits with disobedience of the interim restraint. That mo-
tion was resisted by the counsel of the defendants, and a counter
motion made to modify the restraining order in several par-
ticulars.

The restraining language of the order is as follows:

"Be and are hereby restrained and each and every of them, from collect-
ing and attempting to collect in crowds in the street at or near said com-
plainants' premises, consisting of two silk mills, one in Market street, at
the foot of Jersey street, in Paterson, N. J., and the other on Railroad
avenue, between Grand and Ward streets and the mill of complainants
known as the greater Barnert mill, being in the rear thereof, and fronting
on Dale avenue in said city of Paterson, N. J., and from entering or at-
tempting to enter complainants' said premises and from following in the
street for the purpose of *annoying* or intimidating any person employed
by complainants, and from obstructing or attempting to obstruct the free
passage of such employe or employes of complainants in going to and from
complainants' premises; from in anywise threatening or using any coer-
cive language or coercion whatever in order to induce any employe of com-
plainants not to work for complainants, or in anywise to interfere with
*or annoying by acts or words such employe of complainants against his
will,* and from in any manner interfering with, hindering, obstructing or
stopping any of the business of complainants or their agents, servants or
employes, in the operation of their said plants at Paterson, New Jersey,
and from entering their grounds and premises for the purpose of interfer-
ing with, hindering or obstructing their business, from compelling, induc-
ing or attempting to compel, or induce by threats, intimidation, *annoying
language* or acts of force or violence, any of the employes of complainants
to refuse to or fail to perform their duties as such employes, or from com-
pelling or inducing or attempting to compel or *induce* by threats, intimida-
tion, *annoying language or acts,* force or violence any of the employes of
complainants to leave the service of complainants, and from preventing
or attempting to prevent any person or persons by threats, intimidation,
annoying language or acts, force or violence, from entering the service of
complainants, and from using money of the said association or other
money in furtherance of the purpose of preventing further employes of
complainants from returning to their work and paying money to such
employes to induce them to leave, and from doing any act whatever in
furtherance of any conspiracy or combination to restrain complainants or
its agents or employes in the free and unhindered control of its business,
and from ordering, directing, aiding, assisting or abetting in any manner
any person to commit any or either of the acts aforesaid, and from con-
gregating at or near the said premises of complainants for the purpose of
intimidating complainants' employes or from preventing them from render-
ing their service to complainants and from inducing or coercing by threats,
*annoying language or acts,* said employes to leave their employment and
from in any manner interfering with complainants in carrying on their
business in its usual and ordinary way, and from in any manner interfer--

Frank & Dugan *v.* Herold.

ing with *or molesting any person or persons* who may be employed by complainants in the operation of its plants, and from collecting either singly or in combination with others in and about the approaches to complainants' said plants for the purpose of *picketing, or patroling, or guarding the streets,* avenues, gates and approaches to complainants' said property *for the purpose of intimidating, threatening or coercing* any of the employes of complainants in going to and from their work and the said plants of complainants, and from congregating at or about any places at said Paterson for the purpose of intimidating, threatening or coercing any person or persons seeking employment of complainants and from going either singly or collectively to the homes of complainants' employes or any of them for the purpose of intimidating or coercing any or all of them to leave the employ of complainants, or from entering complainants' employment, or from intimidating or in any manner threatening the wives and families of said employes at their said homes; and *from conspiring in meetings or otherwise conspiring together by threats or other unlawful coercion* to induce or coerce any of the employes of complainants to leave the service of said complainants or prevent any person by threats, intimidation, force or violence from entering the service of complainants."

The language italicized was particularly objected to by counsel for defendants.

*Mr. John W. Harding,* for the complainants.

*Mr. James G. Blauvelt* and *Mr. William Hughes,* for the defendants.

PITNEY, V. C. (orally, after hearing Mr. Blauvelt and Mr. Hughes).

I do not care to hear you, Mr. Harding.

I have had occasion to consider the questions raised by the counsel of defendants, and will state roughly and briefly my views.

The counsel for the defendants complain that the restraining order is very broad and sweeping in its language. I so perceived when I read it before advising it, and yet, notwithstanding, advised it. In fact, so far as the court is concerned, it was intentionally broad and sweeping. There may be one or two words used which reach a little farther than I thought they did at the time; and if, upon further consideration, I should so conclude, I will give the counsel for the defendants the benefit of such

conclusion on the hearing of the motion to adjudge their clients guilty of contempt; but at present I will content myself with giving my views of the rule which should govern in a case of this kind.

Now, in the first place, the defendants rely upon the act of February 14th, 1883 (*P. L. of 1888 p. 36*), which is in these words:

"That it shall not be unlawful for any·two or more persons to unite, combine or bind themselves by oath, covenant, agreement, alliance or otherwise to persuade, advise or encourage, by peaceable means, any person or persons to enter into any combination for or against leaving or entering into the employment of any other person, persons or corporation."

And they point to an opinion of Vice-Chancellor Green, in *Mayer* v. *Journeymen Stone Cutters' Association, 2 Dick. Ch. Rep. 519,* where (at *p. 531*) that learned judge treats that act as having changed the common law of the land.

It is perceived at once that the only thing legalized by that act is the combination to "persuade, advise or encourage." Strictly speaking, it does not reach far enough to legalize the persuading, advising or encouraging, but only the combination to do these things. But, granting that it does intend to legalize the persuading, advising or encouraging by peaceable means, it still fails to legalize the acts which are complained of by the affidavits upon which are based the motion for an adjudication of contempt.

Again, I conceive that whatever was said by Vice-Chancellor Green about that statute in that case was a mere *dictum,* and not necessary for the decision of the cause. But, further, it seems to me that the learned vice-chancellor's attention was not called to what I conceive to be the true principle to be applied in the construction of that act; and whatever may have been in his mind at the time, I must look at his later expression and opinion, as found in the case of *Barr* v. *Essex Trades Council, 8 Dick. Ch. Rep. 101.*

In my judgment the true construction of the act of 1883 is simply that it renders innocent, as against the public, an act which, previous to its passage, was a misdemeanor and punish-

able by indictment. It does not take away, or in anywise affect, any private rights which may arise out of acts which are legalized by that legislation.

It is palpable that the legislature was dealing with a criminal act, and the language of the statute must be construed accordingly. It cannot be construed as rendering an act lawful, as against an individual, which otherwise would be unlawful. For instance, if the legislature should, by a proper act, declare it lawful for one person to commit an assault and battery on another, that legislation would, according to first principles, be construed as simply preventing the person from being punished by indictment for the assault and battery, but would not be construed as taking away the right of the individual who had been injuriously assaulted to his action to recover damages for the injury.

That is one illustration; there are many others.

There is, or was, on the statute-book a law making it a misdemeanor for one man to knowingly cut and carry away timber from his neighbor's land. The legislature might repeal that act, and leave it not a criminal act for one man to cut and carry away timber from his neighbor's land, but it would not deprive the owner of the land of his right to recover damages from his neighbor for the cutting and taking away of the timber. In other words, an act may have, and many acts do have, a double aspect; it may be a crime against society, and it may inflict an actionable injury upon an individual. The declaration by the legislature that such an act shall no longer be a crime punishable by indictment will not be construed so as to take away the right of the individual to the remedy for his private injury.

Moreover, if the legislature should declare lawful an act which in itself is an invasion of private rights and inflicts upon an individual an actionable injury, such legislation would be unconstitutional. The legislature of New Jersey, whatever may be the power of the English parliament, has no power to declare that one man may, with impunity, inflict a pecuniary injury upon another, or otherwise invade his personal rights.

So much for the act of 1883, and what has been decided about it in New Jersey.

Now I come to the matter in hand. Some things are thoroughly settled and conceded, and among them is this, that every free person, not subject to criminal restraint, has the right in New Jersey to work, or not to work, as he or she shall see fit; and he or she has the right to exercise that choice without hindrance or molestation. No person has a right to compel a man or woman to work if he or she does not elect so to do; and no person has a right to prevent another from working if he or she desires to work. In my judgment any conduct on the part of any person which tends to hinder or prevent another from working, if he or she chooses to work, is an unlawful infringement of the personal rights of that individual.

It is urged that one person has a right to *persuade* another to work or not to work. That may be if the other person is willing to listen and be persuaded; but no person has a right to impose upon another his arguments or persuasions against the willingness of that other person to listen. No person has the right to invade my private residence, or to accost me as I am walking along the street, to urge or persuade me to a certain course of conduct, if I do not choose to stop and listen to him. And if it shall be asked, How shall he know that it is against my will? my answer is that the law of common civility is the law of the land, and that law is that no person has a right, strictly speaking, to accost another, or speak to him, without either the express or implied consent of that other person. Hence we all know that if a polite stranger accosts another and wishes to occupy never so little of his time, he says, "May I have a moment of your time, sir [or madam]." If it be said that the strict application of this rule would prevent all intercourse between mankind, my answer is that, in practice, there is no such difficulty. Most of our inter-communications are made by implied consent; and where there is no previous implied consent, it is usually obtained by special permission. But, further than that, there is no difficulty, in practice, in any person knowing whether his proposed persuasions are consented to or not; and

certainly, whatever may be said of the proposition just stated, no person has a right to speak to another after he knows that his endeavor is unwelcome.

Applying these principles to the case in hand, the parties defendant are charged by these affidavits with accosting, annoying and molesting, in various ways certain female operatives of the complainants while on their way to and from their work, and also in their homes.

Now, these female operatives, in my judgment, have the right to walk the streets entirely unmolested, without being jostled beyond what is necessary for the ordinary purposes of travel; without having faces made at them; without having epithets cast at them, or, in fact, anything done to make it disagreeable for them to go to and from their work. They have the right to walk the streets to and from their work precisely as if there were no strike at Frank & Dugan's mill, and precisely as any ordinary respectable female would have the right to do.

Now, the various acts which are charged and which are restrained are all within the line which I have attempted to indicate.

The next question is, What standing does that give the complainants, Frank & Dugan, in this court? What right have Frank & Dugan to come here with their bill of complaint seeking to protect these females in the exercise of their undoubted right to walk the streets of Paterson unmolested? The answer to that question is that they are the *servants* of Frank & Dugan. The relation of *master* and *servant* exists between them; and to make out the existence of that relation I desire to say that I do not conceive it at all necessary that there should be a contract in writing, or even verbal, between them to work for any particular length of time. The relation of master and servant, in my judgment, clearly exists when the one person is willing, from day to day, to work for another, and that other person desires the labor and makes his business arrangements accordingly.

Now, we all know that these large manufacturing establishments are carried on in reliance upon the daily attendance of numerous operatives, and that the non-attendance of those opera-

Frank & Dugan *v.* Herold.

tives brings the whole machinery to a stop at once. Their non-attendance has the same effect upon the carrying on of the whole plant as would the disabling of a part of the steam engine driving the machinery of the plant. The work of these operatives is part of the whole operation, and the proprietors of these establishments rely upon it, and experience has shown that they may rely upon it without any written contract with their operatives.

Now, I say that the relation of master and servant exists between Frank & Dugan and these operatives. I do not use the word "servant" in any menial sense. Any person who works for another for a salary is a servant in the eye of the law. In the law the relation of master and servant does not necessarily include anything menial or degrading.

Now, the relation of master and servant being shown to exist, the law is quite clear that no person has a right to entice away another's servant, or to prevent him from performing his duties as servant. The right of a master to have his servant continue in his employ without molestation or enticement by any third party is a property right, so recognized by the law, and well within the rule laid down by Vice-Chancellor Green in *Barr·* v. *Essex Trades Council,* where he shows that the right of a man to carry on his business is a property right.

The law in New Jersey on that subject is found in the case of *Noice* v. *Brown, 10 Vr. 569,* which I happen to think of at this moment.

It is manifest that the object of the defendants, in doing· the acts which have been testified to here in the depositions, was to induce and prevent the operatives of the complainants from working for them. There can be no doubt about that. Counsel for defendants did not have the assurance to go so far as to say that their clients did not, by their actions so complained of, intend to prevent these operatives from working for the complainants. The whole object of the strike was to stop the works of the complainants and prevent anybody from working there unless they did it upon certain terms. The point made by the counsel for the defendants is that the means that they are employing to attain that object are lawful. And that is the only

point I have to consider. Is it lawful at all for the defendants to use *any* means to prevent these girls from working for the complainants beyond mere persuasion to which the operatives may be willing to listen? And it is urged that the language found in the restraining order goes so far as to prevent them from getting the ear of these operatives at all and using mere persuasion. My answer to that is that if they have the right to do it at all, it must be with the consent of the operatives; it must not be forced upon them in an offensive manner, either at their homes or as they pass along the streets.

The operatives have the right, which their employers cannot complain of, to consider the question whether they desire to work for them any longer; and for that purpose they have the right to listen to arguments on that subject. And if the defendants wish to use those arguments, with the consent of the operatives, or if they wish to induce the operatives to listen to their arguments, they must hire an auditorium, as other persons would who desire to influence public sentiment—publish their notices, and invite these young ladies to come and hear them. To that, I think, the complainants would have no right to object. I do not mean, however, to express the definite opinion that the defendants have the right to entice the employes of the complainants to quit their work. All I mean to say is this: Conceding that there be such a right, it cannot be exercised in such a manner as to infringe upon the private rights of the operatives, and thereby prevent them, against their real wishes, from continuing to work for the complainants.

Now, then, I think it is quite clear from what I have said that these defendants had no right to use the means which are forbidden by the restraining order now brought in question to prevent these operatives from continuing to work for the complainants, and that, in doing so, they are inflicting an injury upon the complainants, in respect to their private rights, precisely the same as they would if they broke, interfered with or clogged the engine that drove their machinery, and that for such injury the complainants are entitled to a legal remedy by action.

Now, this being so, the next question is, What right have the complainants here in this court asking for the restraining power

of the court? Why, the answer to that is twofold. First, it is quite plain that the relief in damages to be recovered in an action at law is entirely inadequate. It is quite absurd to say that they can sue each of these persons and recover damages against them in separate suits for every little act which, in the aggregate, tends to result in injury. And, in the second place, the injury is continuing and irreparable, and not capable of admeasurement according to legal principles. So that, at law, the remedy is entirely inadequate. It is therefore a clear case for the interposition of a court of equity to exercise its preventive remedy; and that is the particular sphere, at this day, of a court of equity, as contradistinguished from a court of law. It prevents injury. It does not give damages for injuries already sustained, but it prevents an injury from being inflicted.

Now, the application of the remedy in this case, I am quite aware, will be disagreeable, and it may be inefficient. Any judge would prefer to avoid dealing with a case of this kind—would naturally shrink from it; but that is no excuse for his refusing to administer the remedy; and no judge has a right, under his oath of office, to refuse to administer the law because its administration will be disagreeable to him.

Some of these persons charged with improper conduct, with breach of the restraining order, are females, and, above all things, I should like to avoid enforcing the compulsory process of the court against females; and I see here before me now a number of women that I suppose are here in answer to this order to show cause why they should not be adjudged guilty of contempt of the order of this court. I have explained what I think to be their rights, and the rights of the other females whom they are charged with disturbing and molesting on the streets; and I will be very glad to have them come to the conclusion that what I have said is the law of the land agrees with their own sense of justice, and will refrain from that kind of behavior from this time on.

For these reasons I refuse the motion to either vary or discharge the restraining order, and will deal with the case of actual breach of the restraining order upon the lines I have indicated.

Afterwards the vice-chancellor considered the affidavits and counter affidavits tending to show a breach of the restraining order, and also heard oral evidence, and found, as a matter of fact, that several of the defendants had been guilty of a breach of the restraining order, and adjudged them guilty of contempt therefor, fined several and sentenced two to imprisonment. From the decree so advised an appeal was taken to the court of errors and appeals, and dismissed by that court at the November Term, 1901; and afterwards a reargument was refused, as reported in *51 Atl. Rep. 774.*