I. & E. GREENWALD CO. v. IRON MOLDERS' UNION.

1. Injuries arising from, and growing out of, boycotts, strikes and lockouts are continuing and irreparable in their nature, and incapable of admeasurement according to strict legal principles, and their redress therefore is the province of a court of chancery; and this right and power of redress of the courts is inherent in them as a co-ordinate branch of the government and can not be curtailed by legislation.

2. The inducement, on the part of an officer of a labor union, to non-union employes of plaintiff company to quit their employment and join the union, by means of veiled threats as to the possible consequences of acting as a "strike breaker" and by promises of railroad fare for themselves and families to another city and regular employment there, etc., is in violation of the provisions of an injunction theretofore granted commanding the officers and members of such union to desist and refrain from compelling or inducing employes by threats, intimidation, force, violence or unlawful persuasion, from freely continuing in the service or employment of the plaintiff company.

HOSEA, J.

Decision on contempt charges.

Charges in contempt were filed in this case on August 14 against John F. O'Leary, vice-president of the Iron Molders' Union of North America, and Henry Hinnenkamp, business agent of local No. 4 of the Iron Molders' Union of this city, for violation of the injunction issued by this court on September 30, 1904, and still in force.

The specific charge is, that on or about July 17, 1905, O'Leary and Hinnenkamp induced John East and Frank Reid, employes of the plaintiff company, to break their contract with plaintiffs and leave their employ, by paying said

---

*Since this opinion was handed down the same principles were considered and a like judgment rendered thereon by the Supreme Court of Illinois, in a case known as the Kellogg case. (*Kellogg Switch Board & Supply Co.* v. *Brotherhood of Electrical Workers et al.*)

employes, etch, a sum of money, and giving them railway tickets for themselves and wives to Cleveland, Ohio.

All parties were represented in court in person and by counsel and have had full opportunity to present testimony, and cross-examine opposing witness; and the cause was duly submitted to the court for judgment, counsel for both sides waiving argument.

There is no serious dispute upon the material facts. The testimony establishes the fact that the strike condition, which was the occasion of the injunction, still exists; that the strike is conducted directly by local union No. 4, through its officers and particularly through Hinnenkamp, its business agent and financial secretary, but under the supervisory direction of O'Leary, third vice-president and business agent of the Iron Molders' Union of North America, which is an international body with headquarters at Chicago.

It appears also, that the plaintiff company is still operating its business under the protection of the injunction of this court, and was so operating in July, with employes under wages, including East and Reid.

It appears also, without dispute, that East and Reid were accosted at various times and places by O'Leary, Hinnenkamp and other officers of the defendant unions on the subject of their employment, and that the talks finally led to proposals which were accepted, whereby both East and Reid were paid sums of money in cash, and given railroad tickets to Cleveland for themselves and families, with assurances of employment in that city; and that thereupon they quit the employment of the Greenwald Company and went to Cleveland.

The general character of the negotiations leading to this result is clearly indicated. East testifies, O'Leary asked him if he wanted to be "straightened up," and next day Hinnenkamp called and asked him what offer he could make to "straighten him up" and have him take a union card and leave town, and offered him tickets to Cleveland and fifty dollars in cash. The proposition was accepted and

the agreement carried out. The money finally paid included also the five dollars initiation fee of the union.

Reid testifies to visits from officers of the union, and from O'Leary, who told him to call on Hinnenkamp, all culminating in a similar proposition to "straighten him up," and get him out of town. Hinnenkamp paid him twenty dollars and gave him tickets to Cleveland.

Mr. O'Leary frankly testified that when he met East, in May or June, he told him that it was "unfortunate that he should start in as a strike breaker," and that "the odium would stay with him a long time."

Mr. Hinnenkamp also testified that he had charge of the strike on behalf of local No. 4 and that part of his duty was to "get scabs," meaning, to get men away from a non-union shop. He said all molders at Greenwald's foundry were considered "scabs," and he considered it lawful to see parties and get them into the union, and to purchase tickets for them to other cities; also that the issue of a union ticket would of itself compel a man to quit Greenwald's and prevent him from working there under present conditions.

He admits the payment of the money and procuring of tickets for East and Reid, out of the union funds in his possession, including the initiation fee, and claimed the right to issue a card to any one he saw fit to initiate.

Upon these facts the issue is clearly raised whether the seducing away of employes as a means of aiding a strike, falls within the scope of the injunction heretofore issued in this case.

The injunction order in terms commands the defendants, their confederates, servants and agents, and any and all persons aiding and abetting them, to desist and refrain, among other things, from:

1. Hindering, obstructing or stopping any of the business of plaintiff in this city, county or elsewhere.

2. In any manner interfering with the plaintiff company in carrying on its business in the usual and ordinary way.

3. Going either singly or collectively to the homes of the employes of the plaintiff company, or any or either of them,

for the purpose of, and in such a manner as to intimidate, coerce or unlawfully persuade any of said employes to leave the employment of the plaintiff company.

4. Compelling or inducing by threats, intimidation, force, violence or unlawful persuasion, from freely continuing in the service or employment of the plaintiff company.

. The injunction order in this case was carefully drawn, in accordance with orders heretofore made by this court and by other courts in similar cases, and is designed to protect the plaintiff's business against unlawful interference.

There is no longer any question of the right of courts to prevent by their equity powers the commission of wrongs of the character too commonly inflicted in furtherance of strikes, rather than to remit parties to ineffectual remedies at law; and this right and power of the courts is inherent as a co-ordinate branch of the government and can not be curtailed by legislation.

In cases of this kind it is obvious that the injuries to business that can be, and frequently are, inflicted by bodies of men animated by a hostile spirit and a common purpose, are of a diverse character, and are continuing, irreparable and incapable of admeasurement according to strict legal principles. The remedy at law is entirely inadequate, and, as has been well said in a recent case on the subject:

"It is therefore a clear case for the interposition of a court of equity to exercise its preventive remedy, and that is the particular sphere at this day of a court of equity, as contradistinguished from a court of law." *Frank* v. *Herold*, 63 N. J. Eq., 443 (52 Atl. Rep., 152).

In the present case no direct violence is shown; but, if the attitude of the union defendants is truly indicated by Mr. Hinnenkamp, the right is claimed to seduce away workmen by any means short of violence. But whether done with violence or without it, the purpose is clearly the same in both cases, namely, to cripple the business and thus compel concession to the demands of the union. The results, manifestly, are the same in both cases; for, whether

with violence or by means that do not involve violence, the manufacturer is deprived of the assistance of his workmen, his machinery must stop and his business come to a standstill. It follows, therefore, that a mere difference in the means employed in inflicting the injury, provided they are both actuated by an unlawful purpose and both tend to the same unlawful end, can make no difference in the wrongful character of the act. That character is to be determined by the initial purpose and the final result in the end sought to be accomplished.

The case last cited contains a very pertinent and forceful illustration of the nature of the injury inflicted upon an employer by thus seducing away workmen. In the course of the opinion the court says:

"In doing so they are inflicting an injury upon the complainants in respect of their private rights, precisely the same as they would if they broke, interfered with, or clogged the engine that drove the machinery, and for such an injury the complainants are entitled to a legal remedy by action."

These views are not only obviously rational and just, but they have been repeatedly declared and upheld by the courts of last resort. I call attenion here to but two, as illustrating the law applicable in cases like the present.

In *Jersey City Ptg. Co.* v. *Cassidy*, 63 N. J. Eq., 759 (53 Atl. Rep., 230, 232), the court employs the following language:

"That the interest of an employer or an employe in a contract for services is property, is conceded. Where defendants in combination, or individually, undertake to interfere with, and disrupt, existing contract relations between the employer and employe, it is plain that a property right is directly invaded. The effect is the same whether the means employed to cause the workman to break his contract, and thus injure the employer, are violence or threats of violence against the employe, or mere molestation, annoyance, or persuasions. In all these cases, whatever the means may be,

they constituted the cause of the breaking of a contract, and consequently they constitute the natural and próximate cause of damage."

In *Lucke* v. *Cutters' & Trimmers' Assembly,* 77 Md., 396 (26 Atl. Rep., 505; 19 L. R. A., 408; 39 Am. St. Rep., 421), the distinction between persuasion which may be a lawful act and persuasion which is unlawful because used as the instrument of accomplishing an unlawful purpose, is again defined. The court says:

"Merely to persuade a person to break his contract may or may not be wrongful in law or fact, but if the persuasion be used for the indirect purpose of injuring the plaintiff or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which is in law and fact a wrong act, and therefore an actionable act if injury follows from it."

In the case of *Hillenbrand* v. *Building Trades Council,* 14 Dec., 628, which came before me in this court in 1904, I took occasion to review the law as to the relation of employer and employe in order to show that the jurisdiction of the court in the matter was based on ancient precedents of the English law. It may be profitable to repeat a few of the citations.

In *Hart* v. *Aldrich,* Cowp., 54 (1774), journeymen shoemakers, working by the piece and for no determinate time, were enticed away, to the damage of the employer in his business. Lord Holt sustained the case, upon the ground that such a servant is, in law, a servant by the day, whether the work is by piece or by the day.

In *Gunter* v. *Astor,* 4 J. B. Moore, 12 (1819), the defendants clandestinely sent for the workmen of the plaintiff, got them intoxicated and induced them to sign an agreement to leave the plaintiff and to come to them. It was held that as the act was of several and the end unlawful it amounted to a conspiracy.

In *Lumley* v. *Gye,* 2 Ell. & Bl., 216 (1853), the case was made out under a statute known as the statute of laborers, but the court declared that an action lay independently of the statute for maliciously inducing another to break a con-

tract of any description where damage ensues to the party with whom the contract is made, and where two or more persons were concerned in inflicting such injury, an indictment or writ of conspiracy at common law might be maintainable.

In *Bowen* v. *Hall*, 6 Q. B., 333 (1881), nearly thirty years after the decision in *Lumley* v. *Gye*, the Queen's Bench again carefully considered and affirmed the doctrine thus established, and said by Brett, L. J.:

"Whenever a man does an act which in law and in fact is a wrongful act, such as may, as a natural and probable consequence of it, produce injury to another—and, in the particular case, does produce such an injury—an action on the case will lie. And the action does not the less lie because the consequence of the act complained of is the act of a third person. If the persuasion is used for the indirect purpose of injuring the plaintiff or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which in law and in fact is a wrongful act."

In *Angle* v. *Railway*, 151 U. S. 1, 13 (14 Sup. Ct. Rep., 240; 38 L. Ed., 55), the Supreme Court of the United States reviewed the authorities upon this doctrine, citing them with approval, and deducing therefrom the application of the rule to "every case where one person maliciously persuades another to break any contract with a third person," and holds that it is not confined to contracts of service.

The principle is well stated by the Circuit Court of the United States in *Kunsden* v. *Bann*, 123 Fed. Rep., 636:

"Fellow workmen may agree together to leave at once the service of their employer, but having done so, and being no longer interested in the matter, then, notwithstanding certain dicta in cases on the subject, it does not seem clear that they are acting lawfully when they are persuading the servants of their former employer to break their contracts and leave the service. It is a matter that does not concern them any longer; it is a matter that is apparently injurious to their former employer. It seems to me that such an in-

terference in a matter with which they have no rightful con-
cern and which is injurious to another, is not lawful. They
have no right to interfere with the business in any way."

These are a few of the many utterances of the courts de-
claring the settled law upon this subject. See also: *Beck*
v. *Teamsters' Protective Union,* 118 Mich., 497 (17 N. W.
Rep., 13; 42 L. R. A., 407; 74 Am. St. Rep., 421); *Barr* v.
*Trades Council,* 53 N. J. Eq., 101 (30 Atl. Rep., 881; *Mar-
tin* v. *McFeall,* 65 N. J. Eq., 91 (55 Atl. Rep., 465); *State*
v. *Glidden,* 55 Conn., 46 (8 Atl. Rep., 890; 3 Am. St. Rep.,
23); *Southern Ry.* v. *Machinists' Local Union,* 111 Fed.
Rep., 49; *Vegelahn* v. *Gunter,* 167 Mass., 92 (44 N. E.
Rep., 1077; 35 L. R. A., 722; 57 Am. St. Rep., 443); *Plant*
v. *Woods,* 176 Mass., 492 (57 N. E. Rep., 1011; 51 L. R.
A., 339; 79 Am. St. Rep., 330); *Moran* v. *Dunphy,* 177
Mass., 485 (59 N. E. Rep., 125; 52 L. R. A., 115; 83 Am.
St. Rep., 89); *Carew* v. *Rutherford,* 106 Mass., 1 (8 Am.
Rep., 287); *Gray* v. *Trades Council,* 91 Minn., 171 (97 N.
W. Rep., 663; 103 Am. St. Rep., 477); *O'Neil* v. *Behqnna,*
182 Pa. St., 236 (37 Atl. Rep., 843; 38 L. R. A., 382; 61
Am. St. Rep., 702); *Doremus* v. *Hennessy,* 176 Ill., 608
(52 N. E. Rep., 924; 54 N. E. Rep., 524; 43 L. R. A., 797;
68 Am. St. Rep., 203). I have quoted from cases that deal
concretely with the particular matter of "unlawful persua-
sion" in terms that require no explanation. But the same
conclusion results from other and fundamental considera-
tions, and I repeat here what I said in this court in the case
of the *Cincinnati Brewing & Silvering Co.* v. *Precht,* (unre-
ported).

"The bill of rights embodied in the Constitution of Ohio,
guarantees to every citizen an inalienable right—among
others—of acquiring, possessing and protecting property
and of seeking and obtaining happiness and safety; and it is
therein further provided that courts shall be open to every
one for the exercise of his remedy by due course of law for
an injury done him in his land, goods or person. No one
need be told that the right to carry on legitimate business
freely, without molestation or hindrance, is not only the
right and privilege of the citizen under these fundamental

guarantees of the constitution, but is essential to the well-being of every civilized community; and that it is the duty of the courts to afford every reasonable protection for the exercise of such right. The right of the laboring man whose business capital is his skill and industry, is to be upheld and protected equally with the right of an employer of labor to carry on a manufacture involving such employment; and the fact that these rights are reciprocal in nowise lessens the obligation of the courts to see that both are properly protected."

The application of these principles to the case in hand is perfectly clear. O'Leary as a supervisory officer in behalf of the larger body, and Hinnenkamp in immediate charge of the strike operations in behalf of the local union, were acting in co-operation. There is no denial of the material facts. That the parties enticed away were open to the persuasion of money does not lessen the wrong of those who used it. The admission of O'Leary that he began his talks with East by allusions to his being a "strike breaker" and the "odium" that would stay with him, and of Hinnenkamp, that all of Greenwald's men were regarded as "scabs," suggest an inference that behind all the talk and the "persuasion" was the veiled threat of the power of the union, international in its scope.

"Language," said Judge Rufus Smith of this court, in the case of the *Eureka Foundry Co.* v. *Lehker,* 13 Dec., 398, 402, "is none the less a threat because when used alone it appeared harmless, but when used in connection with the tone of voice in which it was expresssed, the gestures accompanying it or other surrounding circumstances, it conveyed to the mind a threat. A veiled threat is still a threat. * * * Any course of conduct upon the part of others which deprives or substantially affects the freedom of mind of such workmen in reaching a decision to remain with him, or the freedom of will in carrying that decision into execution is an unlawful interference with the right of the owner of the business."

Substantially similar language is employed by the Supreme Court of Massachusetts in *Plant* v. *Woods,* 176

Mass.; 492, 493 (57 N. E. Rep., 1011; 51 L. R. A., 339; 79 Am. St. Rep., 330).

Such being the law, it is plain that the defendants named have violated each and every one of the hereinbefore quoted prohibitions of the injunction order.

To seduce away plaintiff's employes for the purpose of aiding the strike was directly to hinder and obstruct and unlawfully to interfere with plaintiff's business. So-called "persuasion" with this object in view is clearly unlawful persuasion, and it is a farce to characterize as "persuasion" the act of enticing men away under such circumstances by the payment of money, with the threat of the union in the background.

It is clear beyond question, upon the evidence and the law, that the defendants, John R. O'Leary and Henry F. Hinnenkamp, have knowingly and wilfully violated the injunction and are guilty of contempt as charged, and such is the finding of the court.

The sheriff will take the defendants named into custody and present them before the bar of the court for sentence.

John R. O'Leary and Henry F. Hinnenkamp, you stand charged with contempt under the statute of Ohio in this behalf, for the violation of an injunction of this court issued on September 30, 1904, and still in force. On this charge you have been tried and have met all witnesses face to face with privilege of cross-examination, and have been attended by your counsel. Upon due and careful consideration of all the testimony, including your own, you have been found guilty as charged, and are before me for sentence. What have you to say before the sentence of the court is pronounced?

Mr. O'Leary and Mr. Hinnenkamp: "Nothing."

THE COURT: The sentence of the court is, that you and each of you pay a fine of $100 for the use of the county, and give an undertaking in the sum of $500 to obey said injunction so long as the same may be in force, and that you stand committed until the fine is paid and the undertaking given.