KEUFFEL & ESSER, complainant-respondent,

*v.*

INTERNATIONAL ASSOCIATION OF MACHINISTS, defendants-appellants.

[Decided January 26th, 1922.]

1. In suits to restrain picketing during strikes, whether or not intimidation exists, is a question of fact, and the presence of twenty-five or thirty pickets may constitute intimidation when a single picket would not.

2. The law recognizes the right of members of trade unions to combine in order that they may deal with their employers on terms approaching equality, but employes must be left unmolested in order that their conduct may be controlled by their reason.

3. In a suit to restrain a trade union and a district business agent from picketing during a strike, the agent who took part in forming, fomenting or aiding to make an effective organization for illegal purposes was not relieved from liability by letting others do the active intervention.

4. Picketing by a great number of pickets during a strike, *held* subject to injunction on the ground of intimidation of those who desired to become employes, although no acts of violence were committed.

On appeal from a decree of the court of chancery.

*Mr. Merritt Lane,* for the complainant-respondent.

*Mr. Mark A. Sullivan,* for the defendants-appellants.

The opinion of the court was delivered by

SWAYZE, J.

This is a motion on bill and affidavits for injunction to restrain defendants, employes of complainant, from improper interference in complainant's business during a strike, and also to restrain Bausch, who describes himself as business agent of

District No. 15 of the International Association of Machinists, from like interference. A preliminary injunction was issued. Speaking generally, it restrained the defendants on the same lines as the defendants in *Jonas Glass Co.* v. *Glass Bottle Association,* *77 N. J. Eq. 219,* were restrained. From the order, so far as this restraint is concerned, no appeal is taken. The appeal is from so much of the order as restrains the defendants from parading in the neighborhood of the plant of complainant, bearing placards or otherwise indicating that a strike is in progress at complainant's plant; and from picketing the place of business of complainant. The object of the appeal, avowedly, is to secure a decision as to the legality of picketing when unaccompanied with violence, molestation of others, annoying language or conduct—in short, what is sometimes called peaceful picketing. Parading in the neighborhood of complainant's plant with placards indicating that a strike is in progress is similar in its legal character to picketing.

Since the present case was argued, the supreme court of the United States has decided the general principle underlying the present facts in a case that has been pending for several years, since, at latest, 1916. *Tri-City Central Trades Council et al.* v. *American Steel Foundries, 238 Fed. Rep. 728; American Steel Foundries* v. *Tri-City Central Trades Council et al., United States Sup. Ct. Advance Sheets No. 2, October term, 1921,* not yet officially reported. The authority of that high tribunal is of such weight as to be practically controlling on us in a class of cases in which it must often, and may always, have the full force of a binding authority. It would be unwise in us to assume to sit in review even if the reasoning of the opinion did not commend itself to our minds, as in fact it does. It is true that that case was within the terms of the Clayton act, and this case, as far as the record shows, is not, but the chief-justice discussed the case also as a matter of common law as well as a matter governed by the Clayton act. We start, therefore, with the ruling in that case as the foundation of our decision. It decided that the employer had the right to the access of his employes to his place of business and egress therefrom without intimidation or obstruction, and the employes recent or expectant had the right to use peace-

able and lawful means to induce present employes and would-be employes to join their ranks. The legality of any particular conduct depends on the facts of the particular case. Picketing may or may not be lawful depending on whether or not it has an immediate tendency to intimidation of the other party to the controversy (to which we add, "if he has ordinary firmness of mind"), or an immediate tendency to obstruct free passage such as the streets afford, consistent with the right of others to enjoy the same privilege. Thus men may accost one another with a view of influencing action but may not resort to persistent importunity, following and dogging. The number of the pickets may of itself make the picketing unlawful, since it may amount to intimidation. Every one knows that threats of bodily harm may be made by a mere show of force without violence of language or breach of the peace, and that mere numbers may intimidate. The real question is, Does the conduct under existing facts amount to intimidation? twenty-five or fifty pickets may, when a single picket probably would not. If information alone were wanted in the pending case, all the information necessary for the defendants to enable them to prosecute their efforts to convert the complainant's employes would have been obtained by a few men. The use of twenty-five or fifty or two hundred as in fact used, was clearly unnecessary, and could not have been intended for any lawful purpose. In view of the testimony as to what actually went on, the vice-chancellor properly held that the conduct of the defendants was an illegal interference with the complainant's property rights.

They were enjoined from personal molestation of persons willing to be employed by complainant with intent to coerce such persons to refrain from entering such employment. They do not appeal.

They were enjoined from loitering or picketing in the streets or on the highways or public places near the premises of the complainants or near any premises with intent to procure the personal molestation and annoyance of persons employed or willing to be employed by complainant, or causing the employes of the complainant to refrain from or refuse to remain in the employ of complainant. They do not appeal.

They were enjoined from violence, threats of violence, insults, indecent talk and abusive epithets, annoying language, acts or conduct, practiced upon any person without their consent with intent to coerce them to refrain from entering the employment of complainant. They do not appeal.

They were enjoined from attempting to cause any persons employed by complainant to leave such employment by intimidation or annoying such employes by annoying language, acts or conduct. They do not appeal.

They were enjoined from going either singly or collectively to the house of any of complainant's employes for the purpose of intimidating, urging, annoying or coercing any or all of them to leave its employ. They do not appeal.

They were enjoined from interfering with, hindering or obstructing complainant's business, and in the operation of complainant's plant in any manner in inducing or compelling, or attempting to induce or compel by threats, intimidation, force or violence any of the complainant's employes to leave complainant's service, or to refuse or fail to perform their duties as such employes. They do not appeal.

They were enjoined from in any manner and by any means molesting or interfering with complainant's employes, or any of them, in going to or returning from their daily work. They do not appeal.

We have mentioned enough of the defendants' conduct which they confess by their failure to appeal. The injunctions against parading and picketing must be read in the light of such admitted conduct. There can, as Chief-Justice Taft said, be no such thing as peaceful picketing in such surroundings and the evidence shows how mere picketing by overwhelming force runs into intimidation and breach of the peace. The law now recognizes the right of members of trade unions to combine in order that they may deal with their employers on terms approaching equality. On the same principles employes must be left unmolested in order that their conduct may be controlled by their reason, unaffected by the *vis metus* of great numbers, which corresponds to the *vis major* of physical force. It might, perhaps, be claimed that the terms of the injunction from which an ap-

peal was taken were unnecessary, in view of the extent of the other restraint, but they were necessary to present the different question of the right to restraint when the situation is such that what would otherwise be peaceful persuasion, becomes in the actual fact a system of terrorism. It was in this view that the terms appealed from were added; we think properly added.

We have referred to the conduct of the defendants at length and specifically because an injunction was issued against Bausch, and it may be argued that he did no more than the trade unions were conceded the right to do in the *American Steel Company Case* above cited. The proof sufficed to show that Bausch was directing the strikers and endeavoring to secure more members for the union with a view to compel the complainants to unionize their shops. He denies that he *actively intervened*; but he accepted their invitation to aid in forming an *effective organization.* We think a man who takes part in forming, fomenting or aiding an effective organization for the illegal purpose for which this organization was in fact used, cannot escape liability by letting others do the work of "active intervention." He aided in forming, fomented and aided an "effective organization" which at once committed unlawful acts, for which it was properly enjoined, as it admitted by failing to appeal. Had he desired to keep within the bounds of the law, the way to do it was to withdraw when his associates (perhaps, in view of the martial character of picketing, we may properly say "his forces") began their violations of law. It does not follow that because aiding in an effective organization may under some circumstances be legal, that will be the case under different circumstances. A very good illustration is to be found in a case that arose during the recent war. *Schenck* v. *United States, 249 U. S. 47, 52.* "We admit," said Mr. Justice Holmes, speaking for the court, "that in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their constitutional rights. But the character of every act depends upon the circumstances in which it is done. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering

words that may have all the effect of force." In the later case of *Abrams* v. *United States,* *250 U. S. 616, 627,* the same judge, although differing from the majority on the case then in hand, said he did not doubt that by the same reasoning that would justify punishing persuasion to murder, the United States may constitutionally punish speech that produces, or is intended to produce, a clear and imminent danger, that it will bring about forthwith certain substantive evils that the United States constitutionally may seek to prevent. We need go no further than Chief-Justice Taft's opinion for an illustration. Speaking of that case he says: "All information tendered; all arguments advanced and all persuasion used under such circumstances were intimidation. They could not be otherwise. It is idle to talk of peaceful communication in such a place and under such conditions." In our present case, the evil to be prevented is the intimidation of workmen—prevention of their free action undisturbed by intimidation. In the existing situation Bausch's conduct tended immediately and directly to unlawful conduct of men associated with him in a common enterprise.

The order for injunction must be affirmed, with costs.

WHITE, J. (concurring).

As has been pointed out it is in effect admitted that the "picketing" in this case abounded in almost all conceivable elements of intimidation, but it is urged that these elements might have been, although they in fact were not, absent, and that, therefore, "picketing" as such should not have been enjoined. This contention raises in my mind the query, "What is the essential and fundamental purpose and effect of 'picketing' as practiced in strike controversies?" for, obviously, it is the intended and actual consequence of the practice which is decisive rather than the ordinary meaning of the name as otherwise used. "What we call a rose, by another name would smell as sweet," and a practice which is intended to, and which does, reasonably cause men of average courage to fear immediate or subsequent bodily injury or death for themselves or their families, or destruction of their homes, or even persecution of their children, as the result of their disregard of a strike order, is none the less intimidation, al-

though called by a name claimed ordinarily to have a peaceful meaning. Personally, I have no doubt that strike "picketing" is intimidation, and that its only efficacy and its only purpose is through the fear which it engenders. As is well known, a crowd has a doubly efficient psychology. It excites its own members when moved by a common purpose, to unreasoned exaltation and excesses of attack, and at the same time (largely because of the atmosphere of this well-known fact) frightens its victims into what would otherwise be quite unjustified depths of terror.

This, as I understand it, is the essence of the opinion by Chief-Justice Taft, speaking for the supreme court of the United States, in *American Steel Foundries* v. *Tri-City Central Trades Council* (decided December 5th, 1921), wherein he says: "The name 'picket' indicated a militant purpose, inconsistent with peaceable persuasion. The crowds they drew made the passage of the employes to and from the place of work one of running the gauntlet. Persuasion or communication attempted in such a presence and under such conditions was anything but peaceable and lawful. When one or more assaults or disturbances ensued, they characterized the whole campaign, which became effective because of its intimidating character, in spite of the admonitions given by the leaders to their followers as to lawful methods to be pursued, however sincere. Our conclusion is that picketing thus instituted is unlawful and cannot be peaceable and may be properly enjoined by the specific term because its meaning is clearly understood in the sphere of the controversy by those who are parties to it." Citing *Barnes* v. *Typographical Union, 232 Ill. 425; Franklin Union* v. *People, 220 Ill. 355; Philip Henrici Co.* v. *Alexander (1918), Ill. App. 568; Vegelahn* v. *Guntner, 167 Mass. 92; Jonas Glass Co.* v. *Glass Association, 72 N. J. Eq. 653; S. C., 77 N. J. Eq. 219; Jersey City Printing Co.* v. *Cassidy, 63 N. J. Eq. 759; Frank* v. *Herold, 63 N. J. Eq. 443; Goldberg* v. *Stablemen's Union, 149 Cal. 429; Pierce* v. *Stablemen's Union, 156 Cal. 70; Local Union, No. 313,* v. *Stathakis, 135 Ark. 86; Beck* v. *Teamster's Union, 118 Mich. 497; In re Langell, 178 Mich. 305; Jensen* v. *Cook and Waiters Union, 39 Wash. 531; St. Germain* v. *Bakery and C. Workers Union, 97 Wash. 282; Jones* v. *E. Van Winkle Gin and Machine Works,*

*131 Ga. 336; Union Pacific Co. v. Ruef, 120 Fed. Rep. 102; Atchison, Topeka and Santa Fe v. Gee, 139 Fed. Rep. 582; Stephens v. Ohio State Telephone Co., 240 Fed. Rep. 759.*

The present case is illustrative of the foregoing idea. Only one hundred and forty out of the seven hundred employes went out on the order for the sympathy strike here involved, but after two days "picketing" by fifty to two hundred "picketers" (largely imported), all except twenty-five of the other five hundred and sixty failed to "show up" at their work. The day after the "picketing" was stopped by the order here appealed from, however, we are advised by counsel that all the employes, except the original one hundred and forty, came back to work, and this, although (according to the affidavits) a large number of them had been called by name and told by "picketers" that if they went back to work they would "get theirs," or "be sorry," or "receive bodily violence." They apparently were not scared by the verbal threats of the individuals after the backing of the crowd was withdrawn, but they were afraid to run the gauntlet of the hostile army of "picketers" standing or parading at and near their entrance to the factory.

For the foregoing reasons I am unable to concede that "picketing" (properly so called), as applied to strike controversies, is ever free from intimidation and obstruction, and I therefore think it is here properly enjoined under the specific term.

GUMMERE, CHIEF-JUSTICE (dissenting).

I concur in the view expressed in the majority opinion that the proofs before the vice-chancellor fully justified his conclusion that the conduct of the defendants constituted an illegal interference with the complainant's property rights, and that the latter was entitled to an order restraining the defendants from further continuing such unlawful conduct. My dissent is based upon what seems to me to be the unwarranted scope of the order appealed from. It contains fifteen different restraining provisions, the validity of most of which, as is pointed out in the majority opinion, is not challenged by the appellants. For the purpose of making plain the reason for my dissent, I need only refer to three of those involved in the appeal, namely, No. 4,

No. 9 and No. 10. They are in the following words: (4) "From loitering or picketing in the streets or on the highways or public places near the premises of the complainant, or near any premises, with intent to procure the personal molestation and annoyance of persons employed, or willing to be employed, by complainant, or causing the employes of the complainant to refrain from or refuse to remain in the employ of complainant." (9) "From parading in the neighborhood of the plant of the complainant bearing placards or otherwise indicating that a strike is in progress at complainant's plant." (10) "From picketing the place of business of complainant."

It is conceded in the majority opinion that picketing may or may not be lawful, depending on whether or not it has an immediate tendency to intimidation of the other party to the controversy (or his employes or those seeking employment with him), or an immediate tendency to interfere with their right of free passage, such as the streets afford, and prevent them from exercising and enjoying that right as fully as do others who enjoy the same privilege. I concur in this view, and approve the order appealed from, so far as it restrains such picketing as has the immediate tendency just indicated; and this the fourth provision of the order does, as I read it. The tenth provision, however, goes much further, and restrains the defendants absolutely from picketing, without regard to whether or not such action would have a tendency to intimidate the complainant or its employes or persons seeking employment with it, and without regard to whether or not it would interfere with their full and free use and enjoyment of the public streets. That it has this effect seems to me too plain for argument; for it is an entirely settled principle of construction that, in ascertaining the meaning of a judicial order or decree, every provision thereof is to be given effect, or, stated in another way, that no provision thereof is to be annulled by so construing it as to make it a mere repetition of an earlier provision therein, unless that purpose be made manifest by the words used. The fourth provision of the order deals with the matter of unlawful picketing, and, under the rule of construction to which I have referred, the tenth provision must be interpreted as dealing with a method of picketing not embraced

Keuffel & Esser *v*. Inter. Asso. Machinists.     *93 N. J. Eq.*

within the restraint imposed by the earlier one; in other words, a method that is not unlawful.

It is to be borne in mind that the purpose of an injunction is not to punish for past offences or violations of the law, but to protect in the future those who have suffered from such violations against a continuance thereof. The learned vice-chancellor, as I have ready stated, properly found that the method of picketing adopted by the defendants constituted an unlawful invasion of the rights of the complainant, of its employes and of persons seeking employment with it, and he was entirely justified in directing an injunction preventing any further violation of those rights by a continuance of the unlawful methods which had been adopted and put in operation by the defendants. But he was not, as I think, justified in going further—that is, in restraining the defendants in the future from the exercise of their legal rights in a peaceful and orderly manner by prohibiting further picketing, even though done in a lawful way.

And what I have indicated with relation to the matter of picketing is also true with relation to the restraining of the defendants from further parading in the neighborhood of the complainant's plant, bearing placards containing a statement that a strike was in progress at that plant, without regard to whether or not the parading shall be done in such a way as to have a tendency to intimidate the complainant, its employes or persons desiring employment with it, and without regard to whether or not it would have a tendency to interfere in any way with the full and free use and enjoyment of their respective rights in the public streets. It is not unlawful *per se* for a body of men to march through the public streets in a quiet and orderly manner (unless prohibited by some municipal ordinance), even though the paraders carry banners or placards of the character indicated in this provision of the order, unless the placards themselves naturally have a tendency to intimidate the owners of the plant, the employes who continue at work therein or persons desirous of seeking employment at such plant; and that they have such a tendency is not shown by the affidavits in the case.

Considering the order appealed from too broad in the respects which I have indicated, I am constrained to dissent from the

view of the majority of my brethren, and vote to reverse it for the purpose of modification along the lines which I have expressed.

I am authorized to state that Mr. Justices Trenchard and Black and Judge Van Buskirk concur in the views expressed in this opinion.

MINTURN, J. (dissenting).

The employes of complainant's plant at Union Hill, being dissatisfied with the terms of their employment, refused to return to work, and sent for Victor Bausch, one of the defendants, to consult and advise with. He advised them to draw up a statement of their demands as to hours and wages, and submit it to their employer, the complainant, for consideration. A committee of employes waited upon complainant for that purpose, but the complainant refused to listen to them. The strikers then resorted to the complainant's plant at Hoboken, by sending some of their number with circulars to distribute among the employes, calling their attention to the fact of the Union Hill strike for "higher wages" and against "intolerable conditions," and urging them to attend a public meeting at a public hall at 107 Washington street, Hoboken, under the auspices of the International Association of Machinists, at which one of the Union Hill employes would be the principal speaker, and Bausch would also speak.

This meeting was attended by over three hundred men and women, only twelve of whom were identified with any labor union. The hall itself is located about one mile and a half from the Union Hill plant, in another municipality, and is located over six city blocks from the Hoboken plant. As a result of that and a subsequent meeting, another committee of complainant's workmen was appointed to wait upon complainant, and to present a request for ten per cent. increase in wages. As in the former instance, the complainant refused to confer with the committee. When this report was made to the employes at the meeting, a resolution was passed unanimously declaring a strike at the Hoboken plant. As a result of this declaration the employes who struck lingered about the streets adjacent to the plant, ob-

440 COURT OF ERRORS AND APPEALS.

Keuffel & Esser *v.* Inter. Asso. Machinists. *93 N. J. Eq.*

serving those who entered and left the place, for the purpose, as the bill of complaint alleges, of intimidating and coercing them to quit their employment. Affidavits accompany the bill which show that efforts at intimidation were practiced in many instances, and the learned vice-chancellor then properly granted a preliminary injunction to suppress that illegality. *George Jonas Glass Co.* v. *Glass Blowers Association,* 77 N. J. Eq. 219.

The restraining order is directed not only against the employes but against Bausch and the labor organization, and this appeal is taken only by these two defendants. In their behalf Bausch presented an affidavit denying the truth of the allegations of the bill as to himself and the association, and alleging that neither he nor the association did any picketing, and that the association had nothing to do with calling the strike, or formulating the demands of the employes. Upon the presentation of that issue of fact the injunction as against these two defendants should not have gone.

The rule is settled, since the determination of this court, speaking by Chief-Justice Beasley, in *Citizens Coach Co.* v. *Camden Horse Railroad Co.,* 29 N. J. Eq. 299, that when the equity of the complainants' bill is disproved by the answer and affidavits, a preliminary injunction is not proper. In that case, as in this, the injunction went not upon the allegations of the pleadings, but upon the sworn statements annexed thereto. "The general rule," says the distinguished chief-justice, "subject to but few exceptions, is that if the facts constituting the claim of the complainant for the immediate interposition of the court are controverted under oath by the defendant, the court will not interfere at the initial stage of the cause." Instances of the application of this rule by this court have been frequent, the latest case being *Brunetle* v. *Montclair,* 87 N. J. Eq. 338, where Mr. Justice Trenchard, speaking for the court, reiterated the doctrine and amplified it to the extent of declaring that "a preliminary injunction will not be granted merely to allay the fears and apprehensions of individuals. They must also show the court that the acts against which they seek protection are not only threatened but will in all probability be committed to their injury."

The bill in this case charges that the active picketing was done by the other defendants, who have not appealed, and charges only against these two appellants an active propaganda to induce the complainant's employes to join the labor union. Neither the association nor Bausch approached the plant, or were at all active in picketing. Upon that subject, under these decisions, we must accept the affidavit of Bausch as true. The injunction, therefore, as against these appealing defendants should not have been ordered at this stage of the proceedings. The appeal is directed to the provisions of the restraining order wherein it prohibits them —*first,* parading in the neighborhood, bearing placards, and *secondly,* picketing the *locus in quo.* As to the first provision of the restraint prohibiting walking the streets, it is unnecessary to repeat the views I expressed in this court, at the last term, in the case of *Bijur Motor Appliance Co.* v. *International Association of Machinists, 114 Atl. Rep. 802.* The facts in this case, however, do not warrant such a provisional restraint, because neither the bill nor the affidavits shows any such action upon the part of any of the appealing defendants; and the answering affidavit of Bausch shows that neither he nor the association approached the premises nearer than the public halls. As against the association such a mandate would necessarily be futile, and must prove to be mere *brutum fulmen,* because not possessing the legal characteristics of a corporation, it has neither a body to be cuffed nor a soul to be consigned to an inferno. In any event, it was simply the formal vehicle through which Bausch as its representative addressed the employes, urging them to become members, with which advice they apparently complied in large numbers.

Who was Valentine Bausch? When the exodus from the Union Hill plant began, the employes sought him as a Moses, to advise and lead them from the hill top, not into a promised land, but into Hoboken, and then the trouble began. He is pictured to us in all the pungent putridity of a labor agitator. Were he a religious or a political agitator, it may be assumed that he would not be accorded the prominence with which the bill invests him; but even as a labor agitator he could invoke the companionship of Lincoln, Wendell Philips and Henry Ward Beecher, not to speak of the immortal Gracchi of Republican Rome. His crown-

ing vice, however, seems to be that he is a Socialist agitator, who associates with a political pariah named Victor Berger, who was expelled from congress, for the American offence of holding war views that differed from the views of the majority of his colleagues. But since the Socialist body constitutes a legally existing political party in the nation and state, and since the dawn of history, great men have associated with Pharisees and sinners, Bausch seems to be not a fit subject, for legal or political excoriation in these times. But the atmosphere of the bill is not sufficiently lurid without the introduction of another celebrity, Patrick Muso. If it were not for the meticulous description of his industrial activities contained in the bill, we would be inclined, from his terpsichorean nomenclature, to assume that he was a lineal product of a league of nations, in which an apostle of the faith militant, combined with the Muses in sponsoring him. But we are disillusioned in this respect by the information that the only distinction he enjoys is that "he is the business agent of Local 351, International Association of Machinists," and that he was convicted for contumacious conduct by the court of chancery in another case, "and was sentenced to three months in the Mercer county jail." *Facilis descensus Averni.*

The head and front of the offending of these men seems to be that they discussed and advised with the employes in neighboring halls the merits of their industrial demand and the legal *modus operandi* for attaining it. This offence, in the contemplation of the bill, seems to be comprehended in the generic offence of "picketing;" and, generally, they are enjoined from consulting, parading, visiting or advising the employes against continuing in their employment.

In this situation we are asked to define "picketing," so that counsel may be in a position to advise their clients regarding their constitutional rights as citizens. This, manifestly, we cannot attempt, since we must deal with each case upon the facts as it is presented.

Some judges have attempted a definition, and as a result we are presented with an illogical and confusing medley of *obiter dicta,* that attempt to define the illegality of what may be a perfectly legal and constitutional act. One learned judge simply

hurdled the inquiry by *petitio principii,* declaring that all picketing is illegal. It might as well be said that all illegal picketing is illegal and the logical circle is thus complete. As well might it be declared that all debating or athletic sports, or boxing exhibitions, are illegal, because some of the participants are occasionally injured, as a result of the contests. This *ipse dixit* is occasionally followed as a precedent, to the utter abandonment of all consideration of our constitutional guarantees. The fact, of course, is as has been observed by Lord Bacon, that an opinion is as good as the reason upon which it is founded. *Cessat ratione cessat ipsa lex.*

There are, however, in this state, satisfactory and reasoned views in the light of personal rights, our legal fundamentals and the constitutional guarantees which extend to every citizen, regardless of employment. Notable among these is that of Vice-Chancellor Stevenson in *Fletcher* v. *International Association, &c., 55 Atl. Rep. 1077;* Vice-Chancellor Pitney in *Frank* v. *Herold, 63 N. J. Eq. 443;* Vice-Chancellor Reed in *Cumberland Co.* v. *Glass, &c., Association, 59 N. J. Eq. 49,* and Vice-Chancellor Green in *Mayer* v. *Journeymens Association, 47 N. J. Eq. 519.*

The trend of legislation indicating the popular will is in the same direction. Thus we have the act of 1883 (at *p. 36, Comp. Stat. 2344*) entitled "An act relative to combining and encouraging other persons to combine," which makes it not unlawful for persons "to persuade, advise or encourage by peaceable means any person or persons to enter into any combination for or against leaving or entering into the employment of any person, persons or corporation." This act was held in the *Jonas Glass Company Case* to relieve such an act of the character of a conspiracy, so as to be the subject of indictment, but was held to afford no justification for an illegal attack upon the property of another. The so-called "Clayton act" (*U. S. Stat. 38 chap. 323 L. 1914 §§ 20, 38; Barnes Federal Code, § 7963*) is to the same effect, and it is therein declared *inter alia:* "Nor shall such organizations or the members thereof be held or construed to be illegal combinations or conspiracies in restraint of trade under the anti-trust laws."

President, now Chief-Justice Taft, when sitting as United States circuit judge in *Phelan's Case, 62 Fed. Rep. 803,* declared: "The employes have the right to organize into or join a labor union which would take action as to the terms of their employment. The officers they appoint, or any other person they choose to listen to, may advise them as to the proper course to be taken in regard to their common employment; or if they choose to appoint any one, he may order them, on pain of expulsion, from the union, peaceably to leave the employ of their employer because any of the terms of the employment are unsatisfactory."

This recital of a sensible, constitutional, legal rule of action in these industrial disputes requires no explanation and no illumination, and, obviously, eliminates the necessity for a more definitive expression upon the subject, either for courts or litigants.

The recent adjudication by the United States supreme court in the *Tri-City Central Trades Council Case,* referred to in the majority opinion, simply elaborates and elucidates this conception of a sensible and constitutional role, declared by the writer of the opinions in both cases.

The conclusion we have reached in this case, it will be observed, but serves to mark another step in the cycle of judicial legislation which, beginning with an appropriate effort to curb agitation of a forceable character, has concluded with an edict which will be construed to put an end to peaceable and constitutional economic agitation. Thus, in *Brennan* v. *United Hatters, 73 N. J. Law 749,* ignoring constitutional limitations peculiar to American government, and basing our conclusion upon a line of English cases, evolved from class conditions, in a land where no constitutional limitations exist, we conceded that the feudal right of property in the man, and his labor, still subsists in the hands of a master. The logical effect of that enunciation has been to prevent by injunction an organization of workingmen (1) from interviewing their co-laborers on the way to work, or in their homes, or "in the neighborhood" of the plant; (2) from walking or parading on the public streets "in the neighborhood" of the plant; (3) from visiting co-laborers in their homes or contributing to a fund to sustain indigent or sick agitators, or from con-

tributing to a fund to continue a strike; (4) from loitering on the streets "in the neighborhood" of the plant, and (5) by this adjudication from hiring a public hall and there publicly discussing a workingman's grievances; and thus we have Prometheus bound.

Nothing further would seem to be necessary to complete the chaplet of judicial legislation, unless it be the invocation of the provisions of the statute of laborers (*23 and 24 Edw. III*), under which the laborer was effectually conscripted to the service of the master, and to that end was hounded as a helot and labeled with the brand of Cain.

In every other walk of life the peaceful activities condemned by these adjudications are quiescently tolerated, if not approvingly recognized.

In an age when the workingman occupied the legal status of a villain or serf, and thus became an appurtenance of the freehold, the legal procedure invoked here was neither impracticable nor unworkable; but in an age of popular enlightenment and in a social order where men are theoretically free and equal, and occupy a legal status of sovereignty, in which schools, libraries and the daily press liberally disseminate an education which fructifies in an enlightened manhood, regardless of avocation, the duration of such an archaic system may be estimated by the passive willingness of an enlightened electorate to tolerate it. For, it is indubitable as a philosophic deduction from the progress of law, as well as from the progress of mankind, that an artificial legal status which thus attempts to environ human endeavor, instead of palliating an existing evil will, deplorable as it may seem, inevitably operate like the deliverance in the *Dred Scott Case*, to precipitate a popular demand for a radical remedy; and the danger of it is, as history attests, that in the evolution "the man with the hoe" very often assumes the not inconspicuous role of a Samson manacled in the temple.

The decree appealed from, so far as it seeks to enjoin the two appealing defendants from exercising the right of free speech in a public hall, should be reversed.

*For affirmance*—SWAYZE, PARKER, BERGEN, KALISCH, KATZENBACH, WHITE, WILLIAMS, GARDNER, ACKERSON—9.

*For reversal*—THE CHIEF-JUSTICE, TRENCHARD, MINTURN, BLACK, VAN BUSKIRK—5.