This bill is filed to obtain an injunction against the Greek Restaurant Workers' Club and certain individuals, some of whom are members of that organization, restraining them from unlawfully interfering with complainant's business, intimidating the complainant's employes, loitering and picketing upon the street in front of complainant's restaurant, and generally from hindering or interfering with or obstructing complainant's business, either by inducing or attempting to induce or compelling by threats, intimidation, force or violence, any of complainant's employes to leave his service, or otherwise, or by interfering with the customers' peaceful patronage of that restaurant. The complainant conducts the Essex Restaurant at 919 Broad street, Newark, New Jersey, and has done so for six years last past. He has built up a substantial business there, the average annual gross receipts *Page 772 
of which amount to $100,000. He employs sixteen persons, including cooks, waitresses, c. The defendants are the Greek Restaurant Workers' Club, sometimes known as "The Lunch Room-Cafeteria-Delicatessen Workers' Club"; David Stein, an organizer and representative of the American Federation of Labor; Costas Dritsas, a member of the executive committee of the Greek Restaurant Workers' Club, and twenty other persons who are either members of said club or were participants in the acts complained of in the bill.
I deem it important, as having a direct bearing on the activities of the defendant club which are here complained of, to now say that in April of this year seven other cases in which bills had been filed in this court, by proprietors of Greek restaurants in and near Newark, against exactly the same defendants as are here named, and in which the acts complained of were of exactly the same character, came before me in the same manner as the instant case. In six of these cases, after hearing on return of the orders to show cause, I advised preliminary injunctions, denying an injunction in the seventh because of lack of proof.
The bill alleges that no strike exists in complainant's restaurant; that there has not been any strike in that establishment; that no employes had been discharged or left complainant's employ during the month preceding the filing of the bill; that none of the present employes of complainant are members of the defendant club; that prior to the acts complained of in the bill representatives of this club called on the complainant's employes and demanded that they join this club on pain of physical violence; that on July 9th, 1926, a representative of the defendant club called on the complainant and tried to induce him to sign an agreement which provided that complainant would not employ anyone in his business not a member of the defendant club; that he declined to do so; that immediately thereafter, members of the club appeared in front of the complainant's restaurant with placards on their breasts and backs on which were printed in bold type the following words: "Strike — the *Page 773 
workers at Essex Lunch are on strike; we are striking to reduce our hours from twelve to ten and one day off a week;" that these men began parading back and forth on the sidewalks in front of the restaurant and so close to the entrance thereof as to interfere with the ingress and egress of the patrons; that the defendants have threatened physical violence against the complainant's employes if they continue to work for complainant and do not strike; the elbowing of patrons, frightening and intimidating them and threats of physical violence against them, and the use of indecent and abusive language; that all of complainant's employes are satisfied with the conditions of their employment, have made no complaint, are not desirous of quitting their employment and do not want to strike.
I think it can be fairly stated that substantially all of the material allegations of the bill are amply supported by complainant's affidavits. On one occasion complainant was obliged to transport two of his employes to their homes by automobile to avoid physical violence with which they had been threatened by some of the defendants, and at least one patron of complainant's restaurant has been assaulted by one of the pickets. At six forty-five A.M. on July 10th, 1926, one of the complainant's employes, while on his way to work, was met at Lincoln Park by several of the leaders of the defendant club and threatened with physical violence in the event that he did not quit his job. Complainant's affidavits show that as high as thirty or forty members of the defendant club or its sympathizers have been in front of complainant's restaurant at one time and have remained there for a period of six hours, assisting as they could in the demonstration which was there being staged. Defendants' affidavits deny this statement and claim that there were never more than two members of defendant club on picket duty in front of the restaurant at one time. An analysis of the affidavits, however, leads me to the conclusion that while there may have been but two members of the defendant club who wore the placards which are here objected to in front *Page 774 
of the restaurant at any one time, there were at least four of the defendants, including the defendants Stein and Dritsas, continuously before the restaurant during all the period of picketing complained of with the exception of a few hours around midnight on July 10th. Stein and Dritsas admit that they were present during most of the picketing period, directing the activities of the pickets. Defendants submit the affidavit of one other labor organizer in support of their claim that no violence or intimidation was practiced by the pickets, and she incidentally states that she was present also during a portion of the time of the picketing operation. I am convinced that the number of members of this club and pickets was much larger than the defendants admit, although it may be that many of the persons congregating before complainant's restaurant were merely onlookers, making up the inevitable crowd that collects on occasions of this kind.
It clearly appears, also, that there is no strike of the employes of complainant's restaurant. It is true that many of the affidavits submitted on behalf of the defendants claim that a "walkout" occurred on July 9th, but a careful analysis of these affidavits discloses the fact that only four of complainant's employes, namely, Vergos, Papaines, Agapitos and T. Gevas, left at that time. It is also true that Agapitos says that ten men walked out, but he does not mention their names and no other affiant makes any such claim, and as against this statement there are the affidavits of four employes of complainant and of the complainant himself to the effect that no walkout occurred and that only one man had left the employ of complainant within one week prior to July 10th. The complainant's proof on this point is conclusive.
Defendants also claim that on July 6th, 1926, the defendant club received a written request from some of the employes of complainant, complaining of their treatment by their employer and seeking the support of the defendant club in calling a strike, if necessary, to obtain compliance with their demands; that the basis of this complaint was that the employes *Page 775 
were required to work twelve hours a day for seven days a week, and that they wanted these hours reduced to ten, and one day off a week. Complainant insists, however, that all of his employes, except two night men, worked nine and twelve hours a day on alternate days for six days a week, and that the average work day was ten and a half hours. The letter referred to is attached to the affidavit of the defendant Stein, and is written on the letter-head of the Lunch Room-Cafeteria-Delicatessen Workers' Club. The following is an exact copy of the letter:
 "Lunch Room — Cafeteria — Delicatessen Workers' Club Reliable Cooks, Waiters and all kinds of Kitchen Help for all occasions at short notice. 262-4 Washington Street, Newark, N.J.
July 6/26 ..... 192
To the Executive Board Lunchroom Cafeteria Delicatessen Workers, Dear Sir and Brothers,
We, the men working at the Essex Restaurant on Broad St. Newark, N.J. do hereby petition you to take action, by declaring a strike if necessary in order that the conditions as our contracts call for, mainly six days a week work and ten hours per day and reconiztion of our organization be lived up to by the proprietor.
 Fraternally yours, NICK E. VERGOS GUSTAV KRAUS JAMES STAVROPOULOS JOHN DOE (Signature illegible) EFSTATHIOS EFSTATHIADIS PETER PAPAINES."
It will be noted that this letter is dated July 6th, and that it bears six signatures, purporting to be the signatures of employes of complainant. A careful examination of defendants' affidavits, however, discloses the fact that of these six, only two were employes of the complainant on the date of that letter. Two others, namely, Stavropoulos and Efstathiadis, had been in complainant's employ but had left of their own accord. Stavropoulos left on July 1st. He is *Page 776 
a member of the defendant club and complains that he was discharged by complainant because of that fact. This is denied by complainant. This, however, is immaterial, the fact remaining that his employment was terminated six days before the letter was written. Efstathiadis voluntarily left complainant's employ on June 19th. According to his own affidavit, he quit because the complainant would not give him a night off when he asked for it. The other two men whose signatures are appended to the letter do not appear to have had any connection whatever with complainant's restaurant. The statement, therefore, in defendants' affidavits that the various conferences which were held with the complainant in an effort to have him reduce, as they say, the hours of labor of his employes, were in response to the request contained in this letter, is false. It affirmatively appears from affidavits submitted by the defendants, and also by the complainant's affidavits, that for a period of three or four months prior to July 9th representatives of the defendant club had been importuning the complainant to reduce the working hours of his employes, as defendants say, but, according to the complainant, in an effort to induce him to unionize his place of business and to make it a "closed" instead of an "open shop." I have no doubt that the claim of the complainant is entirely correct, and my conclusion on this point is based upon not only what appears in this case, which is amply sufficient, but also upon the facts brought to my attention in the seven other bills of complaint filed against these same defendants, and to which reference has already been made. I cannot now divorce my mind of the knowledge of the activities of the defendants gained at the hearings in those cases, all of which are a matter of record in the files of this court. The date given as the commencement of the negotiations between representatives of the defendant club and the complainant corresponds exactly with the period of the activities of that club which were complained of in these seven other cases. It is therefore apparent to me that the demonstration against the complainant's restaurant was merely part of a general *Page 777 
plan to unionize all of the Greek restaurants in Newark and vicinity. This, in fact, appears affirmatively in the affidavit of the defendant Stein. It is also confirmed by the above-quoted letter which speaks of "reconiztion of our organization." The facts in this case are substantially the same as those shown in the other six cases in which injunctions were advised, the only difference being that there is perhaps a little less of threatening by word of mouth and less violence here, due, in my judgment, to the fact that prompter application for relief was made to this court in the instant case than in the former cases. The defendants vigorously deny any acts of violence and allege that their picketing has been conducted in a peaceable manner without molestation of either employes or patrons of complainant's restaurant. Defendants' own affidavits show, however, that the picketing was continued from six A.M. until one A.M. of the following day, during the period in which it was carried on, and until stopped by the restraining order of this court. These affidavits show that the pickets paraded up and down continuously in front of the complainant's restaurant wearing the placards referred to. Defendants claim that the pickets have not even spoken to the employes in complainant's restaurant, and they claim that the picketing is a peaceful, persuasive measure only. But if, as defendants say, the pickets have not communicated with any of complainant's employes, I am at a loss to understand the object or purpose of this picketing unless it is the coercion, by intimidation, of the complainant and his employes into a recognition of the union, coupled, perhaps, with the idea of boycotting the complainant and injuring him in the conduct of his business, by inducing complainant's patrons to withdraw their patronage. No other purpose could possibly be advanced for a continuous parade of pickets, although only two in number, in front of complainant's restaurant for a period of eighteen hours at a stretch. Defendants' affidavits show that there were eight of these pickets working in relays. Complainant alleges that a continuance of the activities of the defendants complained of will irreparably injure his *Page 778 
business, and this is obviously so. The defendants claim that their actions are entirely peaceful and that they are therefore within their legal rights, citing, in support of this contention, numerous decisions of the courts of this and other states and of the United States supreme court, among which may be mentionedKeuffel Esser v. International Association of Machinists,93 N.J. Eq. 429; Forstmann Huffman Co. v. United Front, c.,Committee, c., 99 N.J. Eq. 230, and American Steel Foundries
v. Tri-City General Trades Council, 257 U.S. 184; 66 L.Ed. 189.
They further contend that even if the activities of defendants were not permissible under the cases cited, they have now been legalized by the legislature of this state, and cite P.L. 1926p. 348 ch. 207, in support of this contention. That act is entitled, "An act relating to disputes concerning terms or conditions of employment, the communicating of information and limiting the issue of restraining orders and injunctions in certain cases."
In the view I take of this issue, the first point to be determined is whether or not the picketing and other acts complained of are such as can be justified under our decisions irrespective of the statute referred to; and second, if not, whether that statute is applicable and they can be justified under its provisions.
It has long been recognized in this state that picketing in labor disputes may be legal or illegal depending upon its purpose or the manner of its conduct, the question of the legality or illegality being one of fact to be determined according to the circumstances of each particular case. Fletcher Co. v.International Association of Machinists, 55 Atl. Rep. 1077;Frank Dugan v. Herold, 63 N.J. Eq. 443; Jonas Glass Co. v.Glass Bottle Blowers' Assn., 72 N.J. Eq. 653; affirmed, 77 N.J. Eq. 219; Keuffel Esser v. International Association ofMachinists, supra; Forstmann Huffman Co. v. United, c.,Workers, supra, although in Baldwin Lumber Co. v.International Brotherhood, c., 91 N.J. Eq. 241,
Vice-Chancellor Foster held that "peaceful picketing engaged *Page 779 
in for the purpose of persuasion, regardless of whether the persuasion was addressed to present or prospective employes of complainant" would be enjoined. The Baldwin Case was decided in 1920, prior to the decision of the United States supreme court inAmerican Steel Foundries v. Tri-City G.T. Council, supra, which was decided in 1922. In the Tri-City Case, it is said that Chief-Justice Taft held that peaceful (?) picketing was lawful. This decision was followed by the Keuffel Esser Case, decided by our court of errors and appeals in January, 1922. That court, in commenting on the Tri-City Case, said:
"It decided that the employer had the right to the access of his employes to his place of business and egress therefrom without intimidation or obstruction, and the employes recent or expectant had the right to use peaceable and lawful means to induce present employes and would-be employes to join their ranks. The legality of any particular conduct depends on the facts of the particular case. Picketing may or may not be lawful, depending on whether or not it has an immediate tendency to intimidation of the other party to the controversy [to which we add, `if he has ordinary firmness of mind'], or an immediate tendency to obstruct free passage such as the streets afford, consistent with the right of others to enjoy the same privilege. Thus, men may accost one another with a view of influencing action but may not resort to persistent importunity, following and dogging. The number of pickets may of itself make the picketing unlawful, since it may amount to intimidation. Every one knows that threats of bodily harm may be made by a mere show of force without violence of language or breach of the peace, and that mere numbers may intimidate. The real question is, Does the conduct under existing facts amount to intimidation?"
The results of these decisions are tersely summed up by Vice-Chancellor Bentley in Forstmann Huffman Co. v. United,c., Workers, supra, as follows:
"Under these opinions, I take it, picketing in itself, for all its militant name, may be legal or illegal in a dispute between *Page 780 
employer and employe, according to the manner in which it is carried on." And further: "If, however, this privilege is abused by violence, persistence against the other's wish, annoyance or otherwise, then the employer is entitled to have the striker enjoined from such illegal practice. This shows that it is the opinion of the supreme court of the United States and of the court of errors and appeals of this state that picketing, as such, may not amount to a trespass upon another's rights."
The United States supreme court's own idea of what was decided in the Tri-City Case with respect to picketing is best stated by the distinguished chief-justice who wrote that opinion, and who also wrote the opinion in Truex v. Corrigan, 257 U.S. 312
(at p. 340); 66 L.Ed. 254 (at p. 266), as follows:
"We held that under these clauses picketing was unlawful, and that it might be enjoined as such, and that peaceful picketingwas a contradiction in terms, which the statute sedulously avoided, but that, subject to the primary right of the employer and his employes and would-be employes to free access to his premises without obstruction by violence, intimidation, annoyance, importunity or dogging, it was lawful for ex-employes on a strike and their fellows in a labor union to have a single representative at each entrance to the plant of the employer to announce the strike and peaceably to persuade the employes and would-be employes to join them in it. We held that these clauses were merely declaratory of what had always been the law and the best practice in equity, and we thus applied them." (Italics are mine.)
Obviously, the line of demarcation between peaceful picketing, if there is any such thing, and that which is threatening, intimidating or coercive, is so finely drawn as to be almost imperceptible. While the great weight of authority is to the effect that "peaceful picketing" for a lawful purpose is legal, I have found no case in which the term has been so defined that it may be universally applied. The nearest to such definition is the following language by Chief-Justice Taft in the Tri-City Case,supra: *Page 781 
"We are a social people, and the accosting by one of another in an inoffensive way, and an offer by one to communicate and discuss information with a view to influencing the other's action, are not regarded as agression or a violation of that other's rights. If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free, and his employer has a right to have him free.
"The nearer this importunate intercepting of employes or would-be employes is to the place of business, the greater the obstruction and interference with the business, and especially with the property right of access of the employer. Attempted discussion and argument of this kind in such proximity is certain to attract attention and congregation of the curious, or it may be, interested bystanders, and thus to increase the obstruction as well as the aspect of intimidation which the situation quickly assumes."
As the supreme court in the Tri-City Case cited Frank v.Herold, supra, among other authorities, in support of the decision in that case, it may be inferred that it approved of the language of Vice-Chancellor Pitney in that case, in which he elaborated upon the right of one to accost another on the public highway or elsewhere, and impart or obtain information or present arguments on a given subject. This distinguished jurist's admirable and lucid resume of the reciprocal rights of man in disputes of this kind has been frequently cited with approval by the courts of this and other jurisdictions, and I know of no case in this state where his language has been disapproved. I heartily concur in what he there said.
There is respectable authority to the effect that "there is and can be no such thing as peaceable picketing any more than there can be chaste vulgarity, or peaceful mobbing or lawful lynching" (Atchison, Topeka and Sante Fe Railway Co. v. Gee,139 Fed. Rep. 582), and as the highest court in *Page 782 
the land has held that "peaceful picketing" is a "contradiction in terms" (per Chief-Justice Taft, in Truex v. Corrigan,supra), this statement would seem to have ample support. However, even in our own state "picketing in its mildest form" is said to be "a nuisance." Jonas Glass Co. v. Glass BottleBlowers' Association, supra. Nor have I been able to find any reported New Jersey case where picketing has been the subject of the complaint and where an injunction has not issued. Whether or not this is because the statement of the court in Atchison,Topeka Sante Fe Railway Co. v. Gee, supra, is correct, is not necessary for me to suggest. But in determining whether picketing in a given cause is or is not peaceable, "the real question is, Does the conduct under existing facts amount to intimidation?" Keuffel Esser v. International Association,c., supra. Picketing has been said to be "a pretense for persuasion, but is intended for intimidation," and that while neither intimidation nor fraud can be defined "every person knows whether his acts are fraudulent and he also knows whether his acts are intimidating." Union Pacific R. Co. v. Ruef,120 Fed. Rep. 102. It is obvious, however, that intimidation does not necessarily depend upon numbers, and numbers are always comparative. In the Keuffel Esser Case, Mr. Justice Swayze said that "twenty-five or fifty pickets might be intimidating where a single picket probably would not;" but the reverse may also be true. Where the massing of twenty-five or fifty pickets might not intimidate the employer or employes of a plant employing thousands of workers, two or three, or even one, might be intimidating where the number of employes is small, as here.Harvey v. Chapman, 226 Mass. 191; 115 N.E. Rep. 304. Nor is it necessary that the picket or pickets intimidate by word of mouth or by actual physical violence. Barr v. Essex TradesCouncil, 53 N.J. Eq. 101; Keuffel Esser v. InternationalAssn., supra. Restraint of the mind is just as potent as a threat of physical violence. Webb. v. Cooks' and Waiters'Union (Texas Civil Appeals), 205 S.W. Rep. 465. A single sentinel, constantly parading in front of a place of *Page 783 
employment for any extended length of time may be just as effective in striking terror to the souls of the employes, bound there by their duty, as was the swinging pendulum in Poe's famous story "The Pit and the Pendulum" to the victim chained in its ultimate path. In fact, silence is sometimes more striking and impressive than the loud mouthings of the mob. It is the show of force back of the demonstration, or the inevitableness of the impending disaster, which tries men's souls and drives them to desperation. It is admitted that back of the present demonstration is the full force and power of the American Federation of Labor, of which the pickets are mere sentinels or scouts. In Gompers v. Bucks Stove and Range Co., 221 U.S. 418,439; 55 L.Ed. 797, 805; 34 L.R.A. (N.S.) 874, the court said:
"But the very fact that it is lawful to form these bodies, with multitudes of members, means that they have thereby acquired a vast power, in the presence of which the individual may be helpless. This power, when unlawfully used against one, cannot be met, except by his purchasing peace at the cost of submitting to terms which involve the sacrifice of rights protected by the constitution, or by standing on such rights and appealing to the preventive powers of a court of equity. When such appeal is made, it is the duty of the government to protect the one against the many as well as the many against the one."
With the knowledge of this force back of the movement, one picket may well strike terror to the employer or his small band of employes. The fact that the pickets in this case paraded continuously, soldier-like, in front of the complainant's place of business, for a period of eighteen hours at a stretch, gave this picketing a sinister aspect, irrespective of whether or not threats by word of mouth were made, or acts of violence indulged in. Coupled with the fact that the pickets remained silent, as is alleged by the defendants, and communicated with no one, this constant parading was intimidating in itself.
But the proof here goes further. Threats of physical violence, dogging, and persistence in the acts of the defendants *Page 784 
against the will of the complainant and his employes is shown. These are especially mentioned as inhibited in the Tri-City and in the Keuffel Esser Cases; but aside from this, what is the object of the acts complained of? Is the picketing pursued in quest of information? Obviously not, as the defendants say the pickets communicated with no one. Whatever information is available to the eye is just as available sans pickets and placards. I have already said that the apparent purpose of the defendants was to unionize the Greek restaurants in Newark and vicinity, of which the complainant's restaurant is one, and this against the will of both employer and employes. The instant case is only part and parcel of the general plan. The demands of the defendant club, the union, are that the restaurant proprietors employ only club members and pay them wages and fix hours of work to be determined by the club. There is here no real dispute between employes and employer concerning the terms or conditions of the employment, nor are the defendants acting in behalf of dissatisfied and complaining employes. The letter addressed to the defendant club and purporting to be signed by six of the complainant's employes was a subterfuge, designed merely to afford a colorable pretense for the application of the recent statute of our legislature. But it has been well said that "the law is not to be hoodwinked by colorable pretenses; it looks at truth and reality through whatever disguise it may assume."Commonwealth v. Hunt, 4 Mt. (Mass.) 111; 38 Am. Dec. 346.
And in Earle v. American Sugar Refining Co., 74 N.J. Eq. 751
(at p. 761), Vice-Chancellor (now Chancellor) Walker said: "A court of equity * * * penetrates all disguises of form, and, disregarding the shadow, grasps the substance."
The date of that letter, but two days after the act became effective, is significant; but the defendants themselves admit negotiations with complainants months before the date of the letter, and these negotiations were all directed, as is the picketing directed, to the unionizing of the whole Greek restaurant business in this vicinity, and of this complainant's *Page 785 
restaurant in particular. It should be borne in mind that there is no strike in the complainant's place of business, and that his employes are not members of the defendant club. True, the defendants have attempted to call a strike, but they have been unsuccessful, and in this attempt they have support neither in law nor in reason. That employes may strike of their own volition does not justify the conduct of members of a labor organization, to which such employes do not belong, in instigating a strike.Ruddy v. United Assn., 79 N.J. Law 467; Eagle Glass Co. v.Rowe, 245 U.S. 275; 62 L.Ed. 286; Hitchman Coal Co. v.Mitchell, 245 U.S. 229; 62 L.Ed. 260; W.H. Snow Iron Works v.Chadwick, 227 Mass. 382; 116 N.E. Rep. 801; Note 6 A.L.R. 918;Harvey v. Chapman, 226 Mass. 191; 115 N.E. Rep. 304.
Picketing, the object of which is unlawful, irrespective of its militant or intimidating character, may be restrained whether peaceable in fact or not. Even peaceful acts, if unlawful and resulting in irreparable injury, may be enjoined.
It, of course, appears that the four employes of the complainant who exercised their right to quit his employment on July 9th, were members of the defendant club; but even admitting, for the purpose of argument, that there were four of complainant's employes who quit on July 9th, which, as I have stated before, is not sufficiently supported by the answering affidavits, and is denied by the complainant, it seems to me that this is merely proof of the suggested plan of these defendants to accomplish an illegal object by the process which has been graphically described as "boring from within" (note26 A.L.R. 158), examples of which are shown in Cyrus Currier Sons v.International Molders' Union, 93 N.J. Eq. 61, and HitchmanCoal Co. v. Mitchell, supra. In the latter case, Mr. Justice Pitney, speaking for the United States supreme court, said:
"This court repeatedly has held that the employer is as free to make non-membership in a union a condition of employment as the working man is free to join the union, and that this is a part of the constitutional rights of personal *Page 786 
liberty and private property, not to be taken away even by legislation, unless through some proper exercise of the paramount police power."
The instant case is similar in principle and facts to Harvey
v. Chapman, supra, where the union was restrained from maintaining a single picket in front of complainant's store, and where it was found that no strike existed and that the statements used on the placards were false, and that the parading and picketing and boycotting was designed merely to compel complainant to discharge employes who had refused to pay union dues.
It is clear that the acts of the defendant complained of constitute an unlawful interference with complainant's business, and cannot be justified under our decisions, and should be restrained unless justifiable under P.L. 1926 ch. 207. That act became effective on July 4th, 1926, and so far as pertinent to this issue reads as follows:
"No restraining order or writ of injunction shall be granted or issued out of any court of this state in any case involving or growing out of a dispute concerning terms or conditions of employment, enjoining or restraining any person or persons, either singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from peaceably and without threats or intimidation recommending, advising or persuading others so to do; or from peaceably and without threats or intimidation being upon any public street or highway or thoroughfare for the purpose of obtaining or communicating information, or to peaceably and without threats or intimidation persuade any person or persons to work or abstain from working, or to employ or to cease to employ, any party to a labor dispute, or to peaceably and without threats or intimidation recommend, advise or persuade others so to do, provided said persons remain separated one from the other at intervals of ten paces or more."
It is contended by the complainant that this act is unconstitutional and that, therefore, the acts of the defendants cannot be justified thereunder. But before considering that question it must first be determined that that act, assuming its constitutionality, is applicable to the present controversy. If not, then the constitutional question is not in issue and *Page 787 
cannot be passed upon here. Legislation of this kind has generally been held to be declaratory of, and not as changing, the laws theretofore in force. Note, 27 A.L.R. 360, 413.
Accordingly, such statutes do not render lawful any act or acts which were unlawful at the time the statutes were enacted, and the existence of a dispute is a condition of the immunity to injunction declared by the statute; nor is it enough that such a controversy formerly existed where the employer has been successful in filling the places of the strikers. Quinlivan v.Dail-Overland Co., 274 Fed. Rep. 56; note, 27 A.L.R. 415. Such statutes have also been held not to apply in the case of strikes for a wrongful purpose. Ibid. I have already held that here no strike, in fact, exists, and that the acts of the defendants complained of are in furtherance of a wrongful and illegal purpose. This statute, therefore, has no application to the present controversy, the constitutionality of the act is not involved, and a consideration of that question is unnecessary.
It is argued that no preliminary injunction should issue in this case because the allegations of the bill and the accompanying affidavits are met by a full and complete denial in the affidavits of the defense. This objection is completely answered by Vice-Chancellor Bentley in the Forstmann HuffmanCo. Case, supra.
It is also urged that irrespective of the application of P.L.1926 ch. 207, the defendants are entitled to a substantial modification of the restraint already imposed in the order to show cause, and motion to that end was made by counsel for the defendant on the return of the order. This motion is denied. This being, as I view it, a case of unlawful interference with a lawful business lawfully conducted, the restraint originally advised is none too sweeping in its scope and effect.
I will advise a decree in accordance with these conclusions. *Page 788